GIFFORD M. MAST, JR. and JUDITH A. MAST, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Mast v. Commissioner
Docket Nos. 43312-85; 43313-85; 43314-85; 43315-85; 43316-85.
United States Tax Court
T.C. Memo 1989-119; 1989 Tax Ct. Memo LEXIS 119; 56 T.C.M. (CCH) 1522; T.C.M. (RIA) 89119; March 23, 1989; As amended March 24, 1989 David J. Duez, for the petitioners. Albert B. Kerkove, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Addition to
Docket
tax under
Petitioner
Number
Year
Deficiency
Sec. 6621(c) [2]
Gifford M. Mast, Jr. and
43312-85
1977
$  4,180
*
Judith A. Mast
1978
2,567
*
1979
468
None
Terrill A. Mast and
43313-85
1977
10,175
*
Melinda L. Mast
1978
3,555
*
1979
5,267
*
1980
5,071
*
1981
4,591
*
Eric W. Mast and
43314-85
1977
5,020
*
Martha E. Mast
1978
2,294
*
1979
2,825
*
1980
3,435
*
1981
3,744
*
Sara B. Mast
43315-85
1977
6,805
*
1978
1,385
*
1979
2,007
*
1980
1,504
*
1981
796
None
Roderick B. Mast
43316-85
1977
5,619
*
1978
1,150
*
1979
2,237
*
1980
907
None
1981
432
None
*121 After concessions, the issues remaining for our consideration are: (1) the fair market value of a stereoscopic photography collection donated to the University of California at Riverside ("UCR"); (2) whether petitioners may allocate among themselves unequal portions of gifts of undivided interests in the donated collection and (3) whether petitioners are liable for an increased rate of interest pursuant to section 6621(c), Internal Revenue Code of 1986 (previously section 6621(d), Internal Revenue Code of 1954). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Gifford M. Mast, Jr. and Judith A. Mast were husband and wife with a residence at Rural Route #1, Davenport, Iowa, at the time they filed their petition in this case. Petitioners Terrill *122 A. Mast and Melinda L. Mast were husband and wife with a residence at 137 Lost Tree Road, Springfield Illinois, at the time they filed their petition in this case. Petitioners Eric W. Mast and Martha E. Mast were husband and wife with a residence at 5320 Case Road, North Ridgeville, Ohio, at the time they filed their petition in this case. Petitioner Sara B. Mast resided at 4150 East 60th Street, #702, Davenport, Iowa, at the time she filed her petition in this case. Petitioner Roderic B. Mast resided at 4150 East 60th Street, #702, Davenport, Iowa, at the time he filed his petition in this case. Gifford, Terrill, Eric, Sara, and Roderic Mast ("petitioners") are siblings, each of which owned an undivided 20-percent interest in a collection of antique stereoscopic negative glass plates, prints, file copies, and related material known as the Keystone-Mast collection (the Collection). In April 1977, petitioners joined in a conveyance of a 25 percent undivided interest in the Collection to UCR, which respondent has conceded to be a qualified charitable organization as described in the Code. [3] Petitioners also collectively donated a second 10 percent undivided interest in the *123 Collection to UCR in 1981. At the time of both donations, petitioners alleged that the fair market value of the Collection was $ 1,427,253, which was based on an appraisal provided by Mr. Mead B. Kibbey ("Kibbey"). Petitioners each deducted varying portions of the 25 percent and 10 percent undivided interests on their Federal income tax returns as charitable contributions. The individual deductions claimed by petitioners were disproportionate and did not correspond to their prorata ownership interests in the Collection. However, their aggregate total deductions equalled 25 percent and 10 percent of the total claimed fair market value of the Collection. On September 6, 1985, respondent simultaneously issued notices of deficiency to each of the listed petitioners which completely denied, inter alia, petitioners' charitable deductions based on a revenue agent engineer's valuation of zero for the Collection. After concessions on a number of issues, respondent continues to dispute the amounts of petitioners' charitable contribution deduction, but asserts a fair market value *124 of $ 450,000 rather than zero. None of the parties contend that the fair market value of the Collection in 1981 differed significantly from the fair market value of the Collection as of the date of the gift in 1977. Contributed Property
The central issue before us is the fair market value of the Collection at the time of the donations. The Collection consists of stereoscopic negatives, stereoscopic file prints, and miscellaneous files and ledgers. The actual size of the Collection is not completely clear. The experts presented by the parties estimate that the negative portion of the Collection consisting of negatives ranges between 105,000 to 150,000. However, an audit by UCR in 1988 revealed that there were in fact 163,135 stereographic negatives and 192,500 stereographic file prints in the Collection. The Collection is the largest archive of glass stereoscopic negatives ever assembled. Stereoscopic image, stereograph, and stereo view are all terms which refer to a photograph viewing technique which was popular between the mid-nineteenth and mid-twentieth centuries. It involves a pair of photographs which, when viewed in a special device called a stereoscope or stereoscope *125 viewer, produce a three-dimensional image. Stereographs are created by first taking a photograph of a desired subject with a special double lens camera. The lenses are two and a half inches apart, which approximates the distance between human eyes. A photographic image on glass or thin acetate is then produced. These were known as stereoscopic negatives or simply negatives. Finally, a print is made from the negative. Both the negatives and the prints display two images of the same subject, each of which was slightly different due to the separation of the two corresponding lenses on the camera. It is this separation which produces a three dimensional illusion when the images are viewed through a stereoscopic viewer. The Collection was developed under the auspices of the Keystone View Company ("Keystone"), which was founded in 1892 by Mr. B. L. Singley. Keystone was in the eye testing business. Keystone developed the Collection in an effort to control the stereograph market, and was successful in that pursuit. By the mid-1920's Keystone had the largest holdings of glass stereo negatives in the world and also had a virtual monopoly on the stereograph business. Keystone continued *126 to add negatives throughout the 1930's, but the process of adding negatives was halted during World War II. After the war and until 1965 negatives were added to the Collection. In 1963 the Mast Development Corporation acquired Keystone and the eye testing business was moved to Davenport, Iowa. One year later petitioners' father, Gifford Mast, Sr. and Mr. John Niemeyer purchased Keystone from Mast Development Corporation. In 1965, Keystone ceased production of stereographs, continuing as a major manufacturer of eye testing equipment. Petitioners acquired the Collection after the death of Gifford Mast, Sr. The Collection was not explicitly given to petitioners, but respondent does not dispute petitioners' underlying ownership rights in the Collection. The Collection is actually a combination of several large collections which had been developed by other major stereograph publishers including the Kilburn View Co., H. C. White Berry, Kelly and Chadwick, C. H. Graves and Keystone's main competitor -- Underwood and Underwood. The stereoscopic negatives in the Collection are actually in two parts. The first part is arranged by publisher. The second part of the stereoscopic negatives *127 in the Collection is referred to as the "unnumbered" groupings. These were those not deemed by Keystone to be important enough for regular publishing. The subjects of the stereographs include a wide range of people and places of general interest to the viewing public. Specifically, the Collection includes images ranging from portraits of Presidents and other famous individuals to landscapes and panoramas from various locations around the world. By an Offer of Gift dated April 29, 1977, petitioners offered to donate an undivided one-fourth interest in the Collection to UCR, with a continuing obligation to donate the rest of the Collection within twenty years of the date of acceptance by UCR. Petitioners also retained the option to receive their ratable share of any royalties earned by UCR with respect to the Collection. UCR accepted the offer and possession of the Collection was taken over by UCR at Meadville, Pennsylvania. Petitioners, by a letter dated December 14, 1981, made a second contribution of a 10 percent undivided interest in the Collection in exactly the same manner as the original contribution. The Collection was later moved to UCR and placed in buildings suitable *128 for its display. As noted above, petitioners deducted disproportionate amounts of the donated interests as charitable contributions. The contributed amounts had no relationship to petitioners' ownership interests, which were identical. Petitioner Gifford M. Mast, Jr., testified that each individual contribution percentage was arrived at based upon a five year estimated earnings stream for each petitioner. Petitioners with higher estimated earnings deducted proportionately higher percentages of the contributed interests as charitable contributions. The aggregate total of petitioners' charitable contribution deductions equalled 25 percent and 10 percent of the fair market value estimate provided by Kibbey, which was $ 1,427,253. In the notice of deficiency, respondent determined that the fair market value of the Collection at the time of both donations was zero, and allowed no deductions. Expert Valuations
Mead B. Kibbey
Petitioners' fair market value estimate, as indicated on their individual tax returns, was based on an appraisal provided by Mead B. Kibbey. Kibbey is alleged to be an expert based upon his experience as a "long time collector of photographic *129 equipment" and his involvement with various historical societies and an art gallery. Kibbey was not a licensed appraiser, and was primarily employed in a different business. Kibbey spent 30-40 hours examining the Collection in preparation for his appraisal and concluded that it was in pristine condition. Kibbey arrived at his opinion by applying a per unit value to the total estimated count of the various items which constitute the Collection. Kibbey originally estimated that the Collection contained 129,732 stereoscopic negatives, but later revised that number to 150,000. The bulk of the value of the Collection was attributed to the stereographic negatives and prints. Kibbey arrived at an individual value for the negatives by looking at replacement cost and arrived at an individual value for the prints based upon sales of allegedly comparable prints. With respect to the negatives, Kibbey computed a per unit replacement cost of $ 11, based upon current photographic costs, travel, etc. Kibbey did not assign a value for historical content. Kibbey then assigned a per negative value of 40 percent of replacement cost which was $ 4.25 per negative. With respect to prints, Kibbey *130 looked to an average of allegedly comparable retail sales as listed in two catalogs. Neither catalog has been offered into evidence. The per print value based upon that catalog average was $ 5. Kibbey's estimate, as revised for changes in actual total unit count, was $ 1,427,253. In August 1987, Kibbey raised his estimate to $ 1,544,368 based upon the updated estimate of the total size of the Collection. Ms. Marjorie Neikrug
Another of petitioners' experts is Ms. Marjorie Neikrug ("Neikrug"). Neikrug is a professional appraiser in that she supports herself through her appraisal activities. She has been the owner and director of a photograph gallery known as Neikrug Photographica since 1970. She is also a senior member of the American Society of Appraisers, a senior member of the Appraisers Association of America, and is also a member of a host of related organizations. Neikrug spent 35 hours personally examining the Collection for purposes of her appraisal and concluded that it was in pristine condition, which, according to Neikrug, means that Collection items can be utilized and reprinted. Neikrug recognizes a number of distinctive approaches to valuation; the *131 income approach, the cost estimate approach, the revenue approach and the market data comparison approach. She estimates the fair market value of the Collection to be $ 1,592,611, based on the market data comparison approach. In arriving at that figure she estimated that the Collection contained 149,900 stereoscopic negatives. Neikrug did not rely on either the income approach or the cost estimate approach in making her appraisal, although they were mentioned in her report. Neikrug relied on the market comparison approach. Pursuant to that method, valuation conclusions are based on comparisons with reported sales, offers to sell by catalog, showroom or gallery pricing, and historical data. More specifically, Neikrug contacted leading galleries and received opinions as to replacement value. She also contacted auction houses and obtained estimates as to replacement value. Finally a "careful review was carried out along with other available data, background knowledge and experience as indicators of value." From this information, Neikrug developed per item values for the various pieces of the Collection. Although she makes general reference to other smaller collections which *132 are allegedly comparable, no specific correlation is made with her assigned individual values. In fact, no direct correlation is made between her stated standards and those values. She simply states the standards and states the values. John S. Waldsmith
Petitioners also introduced Mr. John S. Waldsmith ("Waldsmith") as an expert. Waldsmith was an independent appraiser originally retained and paid by respondent to appraise the Collection. Waldsmith has been a full-time dealer in stereo views and other photographica since 1981. He is not a licensed appraiser and had completed only one appraisal of a much smaller collection previous to his appraisal of the Collection in this case. Waldsmith is Managing Editor of Stereo World magazine, co-founder and member of the Board of Directors of the National Stereoscopic Association, and is the author of numerous articles on stereo views. Waldsmith examined the Collection extensively during visits to UCR in 1982, 1983, 1984, 1985, and 1986. His examination in this case took over 102 hours. Waldsmith agrees that the Collection is the world's largest collection of stereographic negatives ever assembled. He estimates that the fair *133 market value of the Collection is $ 1,207,500. Waldsmith made his valuation determination by breaking the Collection up into component parts and then assigning average per unit values for the items in each segment. He assumed that the Collection contained 159,200 stereographic negatives and 102,100 file prints. He asserts that the stereoscopic negatives are in two major parts. The first part is arranged in numbered order by publisher and the second part is referred to as unnumbered groupings. The unnumbered groupings were those not deemed important enough by Keystone for regular publishing. With respect to the first group, Waldsmith assigned an average per unit value of $ 5.00 based on sales of other similar negatives. One such sale was of a collection of 200 poor quality negatives for $ 1000. Waldsmith purchased some of the negatives in that collection and later sold one for $ 35. He also asserts that many of the negatives in the Collection would have sold for $ 100 in 1977, while hundreds of the negatives would have had little or no value. From this he extrapolates the average per unit value for the first major group of negatives. With respect to the second group of negatives *134 he simply discusses their unique and historic nature and states an average value of $ 10 per negative. With respect to other portions of the Collection, i.e., file prints, ledgers, etc., Waldsmith generally provides a description and then sets forth a 1977 per unit sales price. Finally, he notes that the Collection may have an unascertainable value due to as yet unforeseen uses, such as television documentaries. Penelope A. Dixon
The only expert witness presented by respondent was Ms. Penelope A. Dixon ("Dixon"). Dixon is a full-time appraiser of photography and photographic material. She has worked extensively in the photographic appraisal business. She is a senior member of the American Society of Appraisers and is a member of other related trade associations. Dixon was retained by respondent shortly before trial. Dixon's valuation estimate was primarily based upon sales of five allegedly comparable collections. Dixon's initial fair market value estimate which was rendered before she had personally examined the Collection, was $ 500,000. She subsequently spent two days examining the Collection for the purpose of formulating her opinion. Her final valuation, which *135 was received by petitioners four days before trial, was $ 450,000. Dixon's valuation method does not require a specific estimate of the Collection's size. However, she does dispute petitioners' various estimates of the stereoscopic negative count as excessive. At trial she disputed the UCR audit estimate of 163,135 stereoscopic negatives and insisted that the Collection contains only 105,000 stereoscopic negatives. However, she appraised the Collection based on an estimate of 135,000 stereoscopic negatives. Dixon determined the fair market value of the Collection by estimating the price at which a comparable collection could be sold, in its entirety. Although Dixon did provide price ranges of boxed and individual stereographic prints in her report, they were apparently provided only for informational purposes. We note that those cited individual prices refer to stereographic prints, not negatives. Dixon cited five separate collections as comparable: the Philippe Halsman Archive, the Todd Webb Archive, the Darrah collection, the Underwood and Underwood collection, and the William Chase collection. The Philippe Halsman Archive consisted of approximately 80,000 negatives and *136 50,000 prints from the 1940's through the 1960's. It was purchased by a Mr. George Rinhart ("Rinhart") in 1976 for $ 150,000. However, according to both Neikrug and Waldsmith, these negatives and prints are photographs, not stereographs. Neikrug also indicated that Evon Halsman, Philippe Halsman's wife, retained rights to the negatives for her lifetime. The Todd Webb Archive consisted of approximately 50,000 negatives and 10,000 prints from the 1940's to the 1970's. It was purchased by Rinhart in 1978 for $ 60,000. According to Waldsmith these were photographs not stereographs. In addition, Neikrug testified that the Todd Webb Archive was subject to copyright restrictions. The Darrah Collection consisted of 120,000 stereographs. It was purchased by Rinhart in 1977 for $ 80,000. The University of Georgia purchased 50,000 of these stereographs in 1978 for $ 50,000. Neikrug testified that the stereographs in this sale were prints and not negatives. Waldsmith testified that the subjects of the Darrah collection stereographs sold to Rinhart were of little interest to the general public. Moreover, Waldsmith maintains that the stereographs subsequently sold to the University of *137 Georgia were the "dregs" of the collection. The Underwood and Underwood Collection consists of 1.5 million photographs and stereoscopic negatives. It was purchased by Rinhart in 1978 for $ 117,500. This collection included approximately 100,000 stereoscopic glass negatives, 40,000 stereographs, 100,000 file prints and ledger books and over one million 5 x 7 enlargements made from the negatives. Dixon, in her report, states that Rinhart has made sales of the stereographs in groups for an average of 50 cents each. She also states that Rinhart has sold a lot of 30 stereoscopic negatives of Babe Ruth for $ 100. Finally, Dixon reports that Rinhart would sell between 30,000 and 50,000 of the Underwood and Underwood Collection stereoscopic negatives, which include famous pictures of Roosevelt and Mark Twain, for $ 100,000. Waldsmith testified that the stereoscopic negatives in the Underwood and Underwood Collection were similar to those found in the Collection, but were of inferior quality. In addition, Waldsmith indicated that a large number of the negatives in the Underwood and Underwood Collection had been partially destroyed in that half of the image had been scratched out. *138 OPINION There is no dispute in this case that an actual donation was made to a qualified charitable donee under section 170(c). The only issues before us are the fair market value of the Collection, whether petitioners may allocate among themselves unequal portions of gifts of undivided interests in property, and whether petitioners are liable for additional interest under section 6621(c) (formerly section 6621(d)) due to a substantial underpayment of tax. Section 1.170A-1(c)(1), Income Tax Regs., provides that the amount of a charitable contribution deduction made in property other than money shall be the fair market value of the property on the date of donation. Section 1.170A-1(c) (2), Income Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." See United States v. Cartwright,411 U.S. 546, 549 (1973); Johnson v. Commissioner,85 T.C. 469 (1985). *139 Fair market value is a question of fact to be determined from an examination of the entire record. Lio v. Commissioner,85 T.C. 56 (1985), affd. sub nom. Orth v. Commissioner,813 F.2d 837 (7th Cir. 1987). The question of value is inherently factual in nature. Kaplan v. Commissioner,43 T.C. 580 (1965). The Court must consider opinion evidence presented by the parties together with all other relevant evidence in the record. Estate of Smith v. Commissioner,57 T.C. 650 (1972), affd. 510 F.2d 479 (2d Cir. 1975). Since the parties have taken extremely divergent positions as to the fair market value of the Collection at the time of the donation to UCR, we must make that determination. Usually, petitioners bear the burden of proving that the Commissioner's determination of the fair market value of property involved in the case is in error. Rule 142(a), Welch v. Helvering,290 U.S. 111 (1933). In the particular circumstances of this case, however, we believe the weight to be given respondent's *140 determination of value should be modified and the burden of petitioners to show error in that determination should be mitigated to some extent. In the notice of deficiency, respondent determined the value of the Collection to be zero. At the trial respondent offered the testimony of an expert witness, who testified that the value of the collection was $ 450,000-$ 500,000. Respondent offered no additional evidence to support either his zero value determined in the notice of deficiency or the value found by his only expert witness at the trial. On the other hand, petitioners offered the testimony of several experts, one of whom had originally been retained by respondent, all of whom testified the value was much greater. Under such circumstances any presumption of correctness that might attach to respondent's determination in the notice of deficiency loses its conviction. See Helvering v. Taylor,293 U.S. 507 (1935); Llorente v. Commissioner,649 F.2d 152 (2d Cir. 1981), reversing in part 74 T.C. 260 (1980); Suarez v. Commissioner,58 T.C. 792 (1972). By this we do not mean that *141 the burden of proof shifts from petitioners to respondent but only that petitioners' burden may be somewhat lightened. In addition, as noted above, respondent offered the testimony of only one witness who was offered as an expert at the trial. We do not question the expertise of respondent's witness; she appeared to be quite well qualified. But under the rules of this Court, if a witness is to be offered as a valuation expert, a written valuation report must be served on both the Court and opposing counsel at least 15 days before the call of the trial calendar on which the case should appear (Rule 143(f) (1) Rules of Practice and Procedure, United States Tax Court). The reason for this is clearly illustrated in this case which involves a very unique type of property, consisting of many parts, which is seldom traded in the marketplace. The valuation approaches by the various experts were quite different. Respondent's valuation report was not served on either petitioners or the Court until several days before the trial. Neither petitioners *142 nor the Court had time to fully analyze the witness report nor ask her questions about it while she was in Court. Furthermore, the parties were not left with time to knowledgeably discuss settlement, for which this case cries out. When respondent's expert's testimony and valuation report were offered as evidence at the trial, the Court received them, over petitioners' objections, perhaps because the Court was entirely unfamiliar with the property being valued and methods used by experts in doing so, and was anxious to get as much information on the subject as was available. All three of petitioners' experts used valuation methods which differed substantially from that employed by respondent's expert. Petitioners' experts estimated a per unit cost for the various elements of the Collection and multiplied those figures by varying total counts. Respondent's expert determined fair market value by looking at sales of allegedly comparable collections. Petitioners' expert Kibbey examined and estimated the fair market value of the Collection at the time of petitioners' initial contribution. Although we are not overly impressed with Kibbey's qualifications as a "long time collector *143 of photographic equipment," his methodology bears further examination. Kibbey looked to replacement value as a basis for valuation of the negative portion of the Collection. We think, given the fact that the Collection is rather unique because of its size and content, that this is a fairly reasonable approach. His method of determining replacement value, by looking at current photographic costs, is also acceptable. However, the valuation of each negative at 40 percent of replacement cost seems somewhat arbitrary. He testified that his depreciation discount factor was conservative, but an explanation of why it was conservative was not forthcoming. With respect to the file prints, Kibbey examined retail sales from two catalogs. Neither catalog was entered into evidence, so we must rely on Kibbey's testimony to verify the relevance of their content. He testified that the prints listed in those two catalogs were stereographs as opposed to the stereographic file prints contained in the Collection. He also testified that the file prints were stereographs kept in company files and were generally in better condition than most stereographs. Kibbey finally drew an estimate of $ 5 per *144 file print from the catalog prices which ranged from $ 3.76 to $ 20.85. We find Kibbey's estimate of the negative portion of the Collection to be relatively persuasive, but we are disturbed that a more specific mathematical computation of fair market value was not produced. We are also somewhat skeptical about accepting values for the file prints based on stereographic print prices which we have not actually seen. Again, with respect to the print portion of the Collection, averaging computations have not been supplied. In summary, we find Kibbey's opinion to be persuasive, but not convincing in and of itself. His basic methodology seems sound, but a more specific explanation of his calculations would make his opinion much more persuasive. Petitioners' expert Neikrug used a valuation method which bears marked similarity to that employed by Kibbey. At trial she testified that she used the cost estimate approach and the market data comparison approach. She testified that the cost estimate approach was based on the cost of hiring a photographer, travelling expenses, materials, office expenses and personnel. Although she states that she used these factors, they are not delineated *145 in her report. Neikrug's market data comparison approach relies on opinions derived from auction houses, galleries, her background and experience. Again we are left without any specific compilation of the data which she used in arriving at her estimate. The cost estimate approach is quite similar to the method used by Kibbey. Unfortunately Neikrug does not illuminate the intricacies of her computation for us. She simply sets forth fair market values for portions of the Collection. The market data comparison approach, in theory, seems reasonable to us. However, Neikrug again provides no guidance as to its precise operation. Although Neikrug's qualifications are impressive, we have difficulty relying solely on her estimate of $ 1,592,611 to support petitioners' fair market value assumption. Petitioners' expert Waldsmith made his valuation determination by breaking the Collection up into component parts and then assigning values to each segment, based on a per unit average. With respect to the negatives, those averages were derived from a few isolated sales. As for the rest of the Collection, Waldsmith simply described each component and assigned it a fair market value. We *146 accept Waldsmith's qualifications and his stated method. However, we are left facing a gap between the stated method and Waldsmith's conclusion. Hence, his opinion cannot stand alone to support petitioners' valuation estimate. Respondent's expert, Dixon, used a valuation method which differed substantially from that employed by petitioners' three experts. She determined fair market value based on sales of five allegedly comparable collections. To assess the viability of Dixon's valuation estimate, we must examine the comparability of those five collections; The Philippe Halsman Archive, The Todd Webb Archive, The Underwood and Underwood Collection, The Darrah Collection, and the William Chase Collection. The Philippe Halsman Archives was not truly comparable to the Collection because it consisted of photographs, not stereoscopic cards or stereoscopic negatives. In addition, it was purchased with restrictions which Dixon did not mention in her report. The Todd Webb Archive contained stereoscopic prints, not stereoscopic negatives. Moreover, Waldsmith testified that these prints were photographs, not stereoscopic prints. Even if the prints in the Todd Webb Archive are stereoscopic *147 prints, evidence of their sales price only has direct relevance to the print portion of the Collection. We do not see that any immediate inference can be drawn with regard to the stereoscopic negatives, which comprise a sizable portion of the Collection. We are left then with a $ 60,000 figure which covers both 50,000 nonstereoscopic negatives and 10,000 prints which may not be stereoscopic. An allocation between the two groups is impossible without further information. Moreover, the Todd Webb Archive covers subjects from the 1940's to the 1970's, which is a period substantially later than that covered by the Collection. Like the Todd Webb Archive, the Darrah Collection did not include stereoscopic negatives. Waldsmith testified that the subjects of the Darrah Collection photographs were of little interest to the general public. We see no evidence to contradict that testimony. The size and content of the Underwood and Underwood Collection, with its 100,000 stereoscopic negatives and 100,000 stereoscopic file prints, are quite similar to the Collection. However, the negatives in that collection had been defaced. One of the two images had been defaced, destroying their stereoscopic *148 effect. In addition, the file prints in the Underwood and Underwood Collection were only half prints. The $ 117,500 price which Rinhart paid for the Underwood and Underwood Collection is far less than the $ 1,427,453 which petitioners claim the Collection is worth. However, we are persuaded that the poor condition of the Underwood and Underwood Collection distinguishes it from the Collection. At the outset we note that questions of fair market value are more properly resolved through settlement negotiation rather than litigation. In the absence of settlement, we are left to adjudicate the validity of conflicting experts' opinions who are convinced that both their conclusions and methods are correct. "The result is an over zealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement." Messing v. Commissioner,48 T.C. 502, 512 (1967). Unfortunately, since settlement was not forthcoming in this case, we are forced to make such a pronouncement. While the collections chosen by Dixon as comparable *149 are of inferential value in determining fair market value, a direct comparison is unwarranted. Dixon also included per unit price references in the Appendix of her report, but they appear to have been included solely for informational purposes. We also question the viability of an appraisal which was completed on such short notice and without personal inspection, although she did subsequently visit the Collection and revised her estimate down to $ 450,000 from $ 500,000. In summary, while we recognize Dixon's eminent qualifications in the photographic appraisal field, we are inclined to place little emphasis on her valuation estimate. In assessing the persuasiveness of petitioners' expert witnesses, one of which was originally employed by respondent, we are struck by the marked similarity of their methodology. We tend to agree that a per unit method is preferable given the unique size and content of the Collection. We find Dixon's method to be unpersuasive primarily because it was based on sales prices of collections which were not actually comparable. In addition to the similarity of methods employed, we also note that the fair market values proffered by all three of petitioners' *150 experts, ranging from $ 1,207,500 to $ 1,592,611 are fairly close. While we are concerned with the marked lack of direct computational evidence and the continuing discrepancy as to the total size of the Collection, we find that the expert testimony as presented supports, to some extent, the fair market value claimed by petitioners; but giving some weight to the testimony of respondent's expert and other evidence received, we conclude that the value of the Collection was $ 1,250,000. Disproportionate Contributions
Respondent contests the disproportionate allocation of petitioners' contributions. To support this argument, respondent cites section 1.170A-7(b)(1)(i), Income Tax Regs., which provides: A deduction is allowed under section 170 for the value of a charitable contribution not in trust of an undivided portion of a donor's entire interest in property. An undivided portion of a donor's entire interest in property must consist of a fraction or percentage of each and every substantial interest or right owned by the donor in such property and must extend over the entire term of the donor's interest in such property and in other property into *151 which such property is converted. * * * We see nothing in the above cited regulation which convinces us that charitable contributions of unequal portions of undivided interests in property are prohibited. The interest donated by each petitioner does consist of "a fraction or a percentage of each and every substantial interest" owned by each petitioner. Section 1.170A-7(b)(1)(i), Income Tax Regs., does not limit or restrict the various portions of undivided interests in property which individual owners may deduct as charitable contributions. It simply requires that the fractional interest contributed consist of a fraction of the donor's entire interest. Petitioners' evidence to support the disproportionate amounts of that portion of the total value of the Collection deducted as charitable contributions by each individual petitioner in each of the years before us consists of the written Offers of Gift given by the petitioners to UCR in all of the years, and the testimony of Gifford Mast as to how these shares were determined. The Offers of Gift specified only *152 the percentage of the total value of the Collection that was collectively given to UCR by all five of the Masts, and did not explain how those proportions were arrived at. Gifford Mast testified how the individual portions were determined each year. As we understand it, it was based on the flow of income of each of the Masts each year, which translates into what division of the total amounts claimed each year would produce the most benefit taxwise for the group as a whole. Nevertheless, we see no reason why petitioners should not be permitted to so determine the amounts to be claimed by each of the siblings, as long as they each knowingly and intentionally transferred their allotted portion to UCR. Respondent did not determine that they did not make the contributions claimed, nor the specific amounts they claimed, but only that they were not entitled to make deductible gifts in this manner. We note that the contributed interests in this case are distinguishable from those in cases challenged under section 170(f) (3) which denies deductions for certain contributions of partial interests *153 in property. Stark v. Commissioner,86 T.C. 243 (1986). Subparagraph (f)(3)(B) provides that subparagraph (A) shall not apply to: "(ii) a contribution of an undivided portion of the taxpayer's entire interest in property, and ***." Petitioners are therefore entitled to deduct that portion of the total allowable contributions claimed on their respective tax returns. Section 6621(c) Interest
Respondent seeks increased interest pursuant to section 6621(c). Section 6621(c) provides for an increase in the interest rate to 120 percent of the statutory rate on underpayments of tax if a substantial understatement is due to a tax motivated transaction. Section 6621(c)(3)(A)(i) includes in the term tax motivated transaction any valuation overstatement within the meaning of section 6659(c). In relevant part, section 6659(c) provides that there is a valuation overstatement if the value of any property claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation. Since the deductions claimed on the returns were less *154 than 150 percent of the values we have determined, section 6659(c) does not apply, and petitioners are therefore not liable for the increased interest provided by section 6621(c). Based on the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Terrill A. Mast and Melinda L. Mast, docket No. 43313-85; Eric W. Mast and Martha E. Mast, docket No. 43314-85; Sara B. Mast, docket No. 43315-85; and Roderic B. Mast, docket No. 43316-85.↩
2. All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Applies to substantial underpayments due to tax motivated transactions. ↩
3. Sec. 170(a) limits charitable deductions to contributions to organizations described in sec. 170(c)↩.