GEORGE H. ENGEL and ASANEE L. ENGEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Engel v. Commissioner
Docket No. 27673-89
United States Tax Court
T.C. Memo 1993-362; 1993 Tax Ct. Memo LEXIS 378; 66 T.C.M. (CCH) 378; August 18, 1993, Filed *378 Decision will be entered under Rule 155. For petitioners: Jeffrey Cole. For respondent: James R. McCann, Patrick T. Sheehan, and Jonathan P. Decator. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: By statutory notice of deficiency, dated August 29, 1989, respondent determined a deficiency in petitioners' Federal income tax for the year 1985 in the amount of $ 56,522. Respondent also determined additions to the tax as follows: Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6659
$ 2,826.10 50% of interest
$ 16,956.60
due on deficiency
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues in this case arise out of various charitable contributions made by petitioner George H. Engel; principally, contributions of various wild game trophy mounts donated to the North Carolina State Museum of Natural History, a small natural history museum that is part of the North Carolina Department of Agriculture. Specifically, after concessions, [1] the issues remaining for decision are: (1) What *379 is the proper valuation of the property contributed; (2) Whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2); (3) Whether there is a valuation overstatement within the meaning of section 6659, whether part or all of the underpayment of tax is attributable to a valuation overstatement, and whether there is a substantial understatement of income tax apart from the valuation overstatement under section 6659 to which an addition to tax under section 6661 attaches; and (4) Whether there is a substantial underpayment attributable to tax-motivated transactions pursuant to section 6621(c). *380 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the supplemental stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Background
At the time the petition was filed in this case, petitioners George H. Engel and Asanee L. Engel, husband and wife, resided in Oak Brook, Illinois. They are cash-basis, calendar-year taxpayers and filed a joint Federal income tax return (Form 1040) for 1985. All references to petitioner in the singular are to petitioner George H. Engel. Petitioners are both medical doctors, specializing in dermatology, and they conduct their practices of dermatology separately. In 1985 they reported salary from their medical practices of over $ 1,000,000. Petitioner is a world-class big game hunter. He is considered to be ranked in the top 25 of world game hunters. He hunts "for fun" and has hunted since he was about 9 years old. Petitioner has hunted for wild game in Spain, Mongolia, Russia, India, Nepal, all of the provinces of Canada, and Africa. He has taken at least 10 safaris to hunt in Africa. Petitioner even hunted in Vietnam during *381 one of his two tours of military duty there, killing a tiger whose skin he brought back to the United States without knowing that it was illegal to do so. Petitioner has hunted as many as 10 of the 21 different world varieties of sheep. Petitioner often has more than one specimen of a particular kind of animal in his personal collection at any one time. The number of animals taken on each hunt varies, and the hunts themselves vary in length from 10 to 35 days. Petitioner has never maintained any log of any of his hunts and has no idea what the cost of any particular hunt was. During a hunt, petitioner usually would not stay in a hotel, except perhaps on the day of arrival and the day of departure. If he did stay in a hotel, petitioner would consider that expense as part of the cost of the safari. Petitioner usually did not sightsee during a safari, but he would "if the opportunity presented itself". Petitioner considered safaris physically and emotionally challenging and very exciting. He enjoyed going on hunts by himself but occasionally would go in the company of friends. Petitioner testified that he regards animals as "beautiful zoological specimens that ought to be preserved". *382 He thinks that game mounts "represent an opportunity for people who haven't been as fortunate, perhaps, as I or other people to see and experience the physical presence of the animal". Petitioner would keep his trophy mounts as a remembrance of an expedition "for a while". Petitioner kept his private collection on several walls of his home and in a gallery. In addition, his game mounts were displayed in the family room, in the bedrooms, and in the guest house. In 1985 petitioner had hundreds of wild animal trophy mounts that he had hunted over the years. Petitioner has been a member of Safari Club International, a hunters' and sportsmen's club, since 1975. Safari Club members can submit a record of their animals for certification and publication in the record books maintained by the Safari Club strictly for its members. Petitioner has listed a number of animals in the Safari Club's record books. Appraisal and Donation of Petitioner's Collection
In the early 1980s, petitioner wished to have his collection of animal mounts and rugs appraised. He contacted the Safari Club International for references of appraisers. Robert Bruce Duncan (Duncan), who is the owner, founder, *383 and president of the Chicago Appraisers Association, was recommended to him as a reputable and well-known appraiser. Duncan advertised his appraisal services for game mounts at conventions and in the Safari Club International's magazine and in trade publications from 1974 through 1989. Duncan would also provide a service where he would find museums willing to accept game mounts for donation. Specifically, he would provide a match service, matching clients wishing to donate animals with tax-exempt museums seeking those particular animals. Duncan's advertising touted the tax benefits of such donations, stressing that big game hunters could deduct the costs of their very expensive hunting trips and safaris that way. Duncan prepared for petitioner an appraisal report, dated October 9, 1985, valuing 18 animal mounts and rugs in petitioner's collection. That report was prepared with the understanding that petitioner would be making an unrestricted gift of those mounts and rugs to the North Carolina State Museum of Natural History, located in Raleigh, North Carolina. [2] *385 In drafting that report, Duncan specifically indicated that he used the cost of replacement method and comparable *384 purchase values in determining the appraisals. Duncan described the type of mount or rug (e.g., "straight shoulder mount") and classified each animal according to specimen quality, taxidermy quality, and rarity. He determined the mount's or rug's value first by replacement costs: prorated cost of hunt, taxidermy and skinning fees, estimated shipping fees, and estimated costs of tags and licenses. He noted that no compensation was allotted for the hunter's time or skill. Duncan then listed values for comparable game mounts and rugs, which comparable values were derived from matching Federal grants to universities and institutional purchases of deemed comparable specimens. Based on his analysis of the replacement costs and values for comparable specimens, Duncan valued petitioner's 18 items to be donated at a total value of $ 126,500. Duncan's appraisal is brief and lacking in detail and explanation of any of the figures contained therein. [3]
Operation of the Museum
Petitioner donated a number of game mounts in 1983, 1984, and 1985 to the North Carolina State Museum of Natural History (the Museum or State Museum). *386 That State Museum was intended to portray and extol North Carolina natural and agricultural history. The Director of the Museum, Dr. Funderburg, was something of a minor monarch in his small domain and had some rather grandiose dreams for his museum. Dr. Funderburg wanted to build a world-class collection of wild game mounts. He wanted as many game mounts as possible to flow into his museum with the idea that he would then cull out the finest and the best for the Museum's collection. Under the program devised by Dr. Funderburg and Duncan, thousands of game mounts flowed into this small State Museum, coming in by the sixteen-wheeler truckload toward the end of each year. The thousands of game mounts flowing into this small State Museum were not treated like other accessions to the Museum's collection. The normal paper trail was not created for these game mounts. Dr. Funderburg personally handled all of the paperwork for the game mounts and did it rather ineptly. The contributed game mounts were not properly identified when received as to the name of the donor and date of contribution. The usual Museum accession records and paper trail of donations were not prepared or maintained *387 for these game mounts. North Carolina State officials, particularly the State legislators, did not seem to share Dr. Funderburg's dreams of grandeur. Rather than encouraging and supporting Dr. Funderburg's grand plan, the State of North Carolina did not fund space to house the game mounts that were coming in regularly from Duncan's clients, with shipments almost every day toward the end of 1985. Some 2,000 game mounts were shipped to the Museum by contributors. Duncan prepared the appraisals for about 95 percent of those game mounts. Only three shoulder mounts were actually on display in the Museum proper. Other game mounts were hung on the walls of an old abandoned building that served as the research center and warehouse for the Museum. Those mounts actually hanging on the walls were in a safe, dry place but with none of the humidity or temperature controls that are necessary to properly maintain game mounts. However, once the wall space was filled, the game mounts were stacked in a damp, leaky basement storage area, where they would deteriorate rapidly from exposure to cold, dampness, and insects. There appears to be no correlation between the quality of a mount and the *388 location in which it eventually was stored. After donation, many of the game mounts that came into the front door of the Museum, without a proper paper trail and probably in explanation of why there was no proper paper trail, somehow went out the back door, again without a proper paper trail. Many of those game mounts, as many as 400, went to one individual; some ended up at a local furrier; some were given to local State legislators by Dr. Funderburg; others simply cannot be accounted for. The paper trail fell into even more disarray after the U.S. Fish and Wildlife Service raided the Museum and seized Dr. Funderburg's records. Dr. Funderburg and Duncan were ultimately charged and pleaded guilty to a conspiracy to import endangered species. Petitioners' 1985 Noncash Charitable Donations
In 1985, petitioners donated various noncash items to charitable organizations, claiming an aggregate appraised value of $ 154,097. Of this amount, $ 126,500 is attributable to the 18 game mounts and rugs appraised by Duncan and donated to the Museum. The remaining amount of $ 27,597 is attributable to various pieces of artwork donated to charitable organizations for auction as well *389 as other noncash donations to the Salvation Army. Duncan provided appraisals for some of those items as well. Petitioners claimed a total noncash charitable contribution deduction on their 1985 joint Federal income tax return in the amount of $ 145,441. [4] Respondent disallowed the total amount of $ 145,441. OPINION Section 170(a) provides a deduction for any charitable contributions, as defined in subsection (c), to qualified entities made within the taxable year. If property other than money is donated, "the amount of the contribution is the fair market value of the property at the time of the contribution". Sec. 1.170A-1(c)(1), Income Tax Regs. Under section 1.170A-1(c)(2), Income Tax Regs., fair market value is defined as: the price at which the property would change hands between a willing buyer and a willing *390 seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * *
The determination of the fair market value of donated property is a factual inquiry. Estate of DeBie v. Commissioner, 56 T.C. 876, 894 (1971). Petitioners bear the burden of proving both the fact that the contributions were made and the fair market value of the contributed property. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). The parties now agree that the donations of the game mounts were in fact made. However, petitioners and respondent vehemently disagree as to the proper methodology for valuing the game mounts and as to the ultimate value thereof. Each side presented expert testimony advocating different methods of valuation. Duncan's Credentials and Method of Valuation
Duncan was one of the first appraisers to perform appraisals of wild game mounts. Duncan studied art history and psychology in college and worked as a taxidermist *391 for 4 years in the mid-1960s. He then worked for an art appraiser for 2 to 4 years in the late 1960s, and himself became an art and antique appraiser. [5] When asked at trial how he became involved specifically with appraising big game mounts, Duncan responded that, in the early 1970s, he joined the Safari Club International and began big game hunting. He has been on 25 to 30 hunts in Africa, Canada, and North, Central, and South America. Being an appraiser of art and antiques, Duncan began to wonder who would appraise his animals for insurance purposes. He began to check into the industry and discovered that there was no such thing as a game mount appraiser. He asked insurance companies the kinds of qualifications that a person would need in order to render such appraisals and decided that he possessed many of the suggested attributes. *392 In developing his own methodology of appraising game mounts, Duncan contacted the few appraisers in the country who were providing game mount appraisals on a piecemeal basis to study the techniques they had devised. Duncan found many of those techniques, such as three times taxidermy costs, to be inadequate and began to formulate his own appraisal method. He started his own company, Chicago Appraisers Association, and began providing appraisals of art, antiques, wild game mounts, and other items to insurance companies, banks, and individuals. Duncan also has served as a consultant to the Smithsonian Museums, the Metropolitan Museum of Art, the Anniston Museum, the Art Institute of Chicago, the Field Museum of Chicago, the Chicago Historical Society, the Illinois Natural History Museum, the Bank of America, the California Historical Society, the International Wildlife Foundation, and the Resolution Trust Corporation. Duncan started using the replacement cost method in 1974 or 1975. Comparable sales were a factor he considered in his valuations, but they were not always available at that time. He viewed auction sales generally as a wholesale market and not a good indicator of *393 comparable values. Duncan clearly stated, on more than one occasion during his testimony, that the replacement cost method is not in itself a valid and legitimate method of valuation: it is one of the methods he uses in determining the value of an animal. At trial, Duncan explained that he would use different methods for valuing art and antiques than for valuing game mounts. For artwork and antiques, he would compare dealers' catalogs, investigate blue book values and auction records, and observe price markings in galleries and stores. For game mounts, Duncan would use a variation of two or three techniques. First, he would determine the cost of replacement of the mount. He would consider the costs associated with a typical, average African safari. He would calculate the cost of airfare, guide fees, licenses, hunting permits, skinners, trackers, shipping, taxidermy, tips for guides, and other additional minor costs. He would then prorate the total amount over the number of animals that could possibly be taken on the safari. Then, Duncan would consider the value of the animal for insurance purposes: he would determine the amount at which an insurance company would *394 issue a policy on an animal and payments made in connection with claimed losses. Duncan would also consider matching grants from the Federal Government's National Endowment for the Humanities, and amounts at which banks would accept game mounts as collateral for loans. Duncan would then raise or lower the amounts determined per animal, depending upon the condition of the animal, the quality of the fur, horns, and the like, and the quality of the taxidermy. He would also factor in comparative sales information, where available and appropriate, and determine a final valuation figure. Over his career, Duncan estimated that he had appraised 2,000 collections, of which 200 collections were the size of petitioner's total collection. Duncan did not prepare an expert report in this Tax Court proceeding and was not called as an expert by either party. See supra note 3. Respondent's Valuation of Petitioner's Donation
Respondent relies upon the expert testimony of Alan Zanotti (Zanotti). Zanotti began his company, the African Import Company, in March of 1986 as a part-time endeavor. He became involved in the sale of animal mounts, skins, and related items after he read an *395 article concerning the overpopulation of certain animals in various parks in Africa. His further research indicated that animal trophies were available because certain animals in the overpopulated areas were being removed to protect the food sources. He thought he could buy such animals, import them into this country, and sell them. Zanotti found that this process was only a fraction of the cost of traveling and hunting the animals himself and worked well for items in great demand, such as zebra rugs. However, he found that this process would be cost prohibitive for shoulder- and full-mounted animals. His research indicated that there was a supply of such mounts already available in the United States, and Zanotti began to develop these sources. [6] *396 He expanded his focus to making purchases from taxidermists and museums to sell to people who want to use mounts and skins for mainly decorative purposes. [7] Zanotti testified that there is a quite active market for game mounts and related items. Zanotti prepared his expert report on August 21, 1991. He states that his appraisal values are based upon how he would negotiate the purchase and sale of each mount. He focuses on determining full retail price or the price at which he could sell a particular piece. Zanotti traveled to the Museum in June of 1991. He viewed a number of mounts labeled "Engel" or "Engel 1984". The record does not establish whether those game mounts bearing petitioner's name and the year 1984 were in fact contributed by petitioner and, if contributed by him, were in fact contributed in that year. [8] Thus, the game *397 mounts that respondent's expert, Zanotti, valued may or may not have been those actually contributed by petitioner. The identification problem was not the fault of respondent's counsel or of respondent's expert. However, in some instances respondent's expert admittedly did not see certain game mounts that he valued. In other instances, where he actually saw certain game mounts, such items may or may not have been those actually contributed by petitioner. The internal record-keeping problems at the Museum and the sheer physical disarray of the Museum and its records made positive identification of a particular donor's specific game mount donations impossible. *398 Petitioners' Expert Report
Petitioners submitted the expert report of Jack Perry (Perry), dated September 10, 1991. Perry is president and curator of the World Wildlife Museum in California, a not-for-profit educational institution which he serves without remuneration. He has also been a taxidermist for over 20 years and has taught taxidermy classes for three California colleges at their request. He has been performing game mount appraisals for 20 years and has performed such appraisals for numerous museums, cities, states, and the Internal Revenue Service as well. Perry based his evaluation on the replacement or reproduction method, which he states is the proper way to evaluate mounted specimens. Perry advocates the replacement method as the only method for appraising game mounts because he views such specimens as unique. He insists that there are no comparable sales figures because specimens are usually sold only in distress or estate sales. [9]
*399 Perry testified that Duncan's competency as an appraiser and his reputation as an honest and honorable man were perceived in 1985 as excellent. He reviewed Duncan's report attached to petitioners' tax return and compared Duncan's figures with previous appraisals of Duncan's of like specimens and found them consistent. Perry also was unable to view the donated mounts and, therefore, based his appraisal solely upon the descriptions made by Duncan. Perry states that he conservatively values the donations at $ 113,000 due to his inability to examine the animal mounts or rugs himself. But, he states that, if the mountain zebra rug valued at $ 5,850 is a cape mountain zebra, its value would increase three-fold because such a zebra would be extremely rare. In an addendum to the appraisal, Perry further states that "The only fair and logical way to establish the value would be to rely heavily on Chicago Appraisers original appraisal of the missing specimens". He states that he had the opportunity to appraise some of petitioner's "magnificent" collection at petitioner's home in 1988 and that the specimens were in excellent condition and indicated a degree of care and pride above average. *400 Perry reiterated that his estimated appraisal, therefore, is conservative. Perry's three-page report consists of conclusions without any underlying support. The Court's Evaluation
This Court evaluates expert testimony in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Parker v. Commissioner, 86 T.C. 547, 561 (1986). We often find expert testimony to be helpful in understanding an area requiring specialized training, knowledge, or judgment.[10] However, we are not bound by any expert opinion that we find contrary to our judgment. We may accept the opinion of an expert in its entirety, or we may be selective as to the portions that we utilize. Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938); Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980); Parker v. Commissioner, supra at 562. *401 The first problem in valuing petitioner's game mounts donated in 1985 is that only Duncan actually saw the donated game mounts. The record establishes that Perry and Zanotti, through no fault of their own, did not view petitioner's donations. Respondent's expert, Zanotti, is a young man who began a small business buying and selling animal mounts and other artifacts of the hunt. He did not begin his small business until 1986, the year after the year involved in this case. He devoted about 25 percent of his time to the new business, had another small business, but wisely kept his full-time job with an auto leasing company. He had no formal education but made an effort to educate himself about the availability of skins and mounted specimens and the possible market for such items. His small business was, after some 5 years, becoming successful and reaching the point where he could perhaps have supported himself from it. Zanotti was a competent and credible witness. However, we are not convinced that Zanotti deals in the same quality of animal mounts as petitioner's game mounts and rugs. Zanotti deals mainly in decorative pieces and novelty items. See supra note 7. He describes *402 himself as a hunter, but not as a big game hunter. He has never been to Africa or outside the United States on big game hunts. Zanotti has no training in taxidermy or biology. He has performed only a dozen appraisals for insurance purposes and has not been asked by an insurance company to perform appraisals for it. Moreover, Zanotti does more buying from museums than selling to them, and he has not sold any big game mounts to a museum. In his literature, Zanotti discusses the market for world class mounts and the purchases and sales in which he has been involved; however, much of this data and sales to which Zanotti refers occurred in 1990 and 1991. No showing has been made of how these values relate to the state of the market in 1985, the year of donation in this case. He has shown to the satisfaction of the Court that there could be a market in such products as decorative pieces but, in 1985 at least, that there was a rather thin and perhaps developing, but not an established, market in world-class trophy mounts. Respondent argues that this case is indistinguishable from Epping v. Commissioner, T.C. Memo. 1992-279, in which Zanotti *403 presented expert testimony and the Court concluded that "an active market exists with substantial comparable sales items". Each case must be decided on its own evidentiary record and its own particular set of facts. In Epping, our conclusion was based on the following: Mr. Zanotti inspected the items donated by petitioner and testified that the items donated were very similar to the items he has bought and sold and the items held in his inventory. Furthermore, Mr. Zanotti testified that he could replace the items donated by petitioner with items of similar quality through his current inventory or by going into the existing marketplace. * * * [Footnote omitted.]
Epping v. Commissioner, T.C. Memo. 1992-279, 63 T.C.M. 3012, 3014, 1992 RIA T.C. Memo par. 92,279 at 1380. However, in this case, Zanotti did not actually see many of the items he appraised and those items that he did see may or may not have been ones that petitioner in fact contributed. See supra note 8. Thus, in this case, we do not think Zanotti can evaluate adequately whether petitioner's game mounts fall within the class of mounts traded in the market *404 in which he (Zanotti) operates. Similarly, petitioner's expert, Jack Perry, a qualified taxidermist and established expert appraiser, did not see the contributed game mounts. Although he relied entirely on Duncan's descriptions, Perry testified that no market existed in such game mounts in 1985. However, Duncan's appraisal, which Perry purported to adopt, contained comparable values for each item as well as replacement costs, albeit both sets of figures were wholly unexplained. See supra note 3. Based upon the record in this case, there is not a sufficient showing of an active market and comparable sales to warrant exclusive reliance upon that method of valuation as respondent would have us do. See Estate of Miller v. Commissioner, T.C. Memo. 1991-515, affd. without published opinion 983 F.2d 232 (5th Cir. 1993). On the other hand, there also is not such a total lack of market as to require the use of replacement cost alone, as Perry advocates. The only appraiser who actually saw the specimens was Duncan, whom both parties to this litigation disparaged, alternately trying to prove he was a liar or *405 trying to rely on him to prove certain aspects of each side's case. [11] Neither party relied on Duncan as an expert. See supra note 3. Petitioners say rather blithely that Duncan stands by his valuation figures completely and then try to use Perry to try to shore up the wholly unexamined and unexplained Duncan appraisal. Respondent called Duncan not as an expert witness, but as a fact witness, only to try to show that petitioner purchased the contributed items rather than hunting them himself. Duncan's testimony did not support respondent's theory. At best, Duncan would agree that some of the items donated in 1983 were not of the quality of petitioner's usual hunting collection. Duncan suspected that petitioner had purchased some of the items because he (Duncan) did not know that petitioner had hunted in Spain or had shot the tiger in Vietnam. *406 Although Duncan acknowledged that he may have overvalued petitioner's 1983 donation due to the surprisingly poorer quality animals than he would normally expect petitioner to have, he felt that the mounts donated in 1984 and 1985 were of the same high quality as other parts of petitioner's collection. Duncan emphatically repeated that he appraised the 1984 and 1985 donations at their true value. We do not, however, accept Duncan's mere ipse dixit as to value. Moreover, we are disturbed by the focus of Duncan's advertising of his services, which emphasizes tax savings through donations and "offsetting today's terrible hunting costs". Duncan has prepared research papers and articles touting a hunter's ability to take advantage of "today's astronomical hunt costs" by donating animals at their current replacement value, although the hunter may have collected the animals inexpensively years ago. Although Congress has chosen to allow charitable contribution deductions for such donations, Congress certainly did not intend for the valuations of such donations of game mounts to encompass a write-off of a recreational big game hunter's vacation. See sec. 170(j) (formerly sec. 170(k)), *407 which now disallows traveling expenses while away from home as charitable deductions "unless there is no significant element of personal pleasure, recreation, or vacation in such travel." Of course petitioner does not claim that he was rendering services to or for the benefit of the Museum in his hunting trips; the issue here is solely valuation of the donated game mounts and rugs. Determining fair market value, however, is extremely difficult when only a thin market for the donated items exists. In order to determine the fair market value of game mounts, it is appropriate to consider replacement costs as one factor in the overall valuation method. Estate of Miller v. Commissioner, T.C. Memo. 1991-515. We find that, in cases of the type herein, a willing buyer of an animal trophy has two choices: buying a willing seller's mount or hunting one himself or herself. Thus, we think that a buyer would consider such costs when weighing these options. We do not think that respondent has satisfactorily shown that the market in which Zanotti conducts his business (decorative pieces, older damaged animals from museums, and hunting relics) *408 appropriately indicates the prices at which petitioner's world-class animal trophies would sell. This requires that Zanotti's figures be adjusted upward to account for the better quality of petitioner's game mounts and rugs and to take into account, to some extent, the factor of replacement costs. Respondent argues that we should consider the post-donation mistreatment of the animal mounts by the Museum in making our valuation determination. We decline to do so. The cases cited by respondent merely suggest that the uses to which a property reasonably may be put are to be considered as important elements in the valuation of the property. See Guggenheim v. Rasquin, 312 U.S. 254, 257 (1941); Estate of Palmer v. Commissioner, 839 F.2d 420 (8th Cir. 1988), revg. 86 T.C. 66 (1986); Chiu v. Commissioner, 84 T.C. 722 (1985). These cases do not suggest that a donee's lack of care is to be imputed to the donor of a charitable contribution. Moreover, respondent has not shown that the Museum necessarily mistreated petitioner's donations: the facts equally suggest that *409 petitioner's high quality mounts could have disappeared out the back door soon after they arrived at the Museum. While we think Zanotti's figures would have to be adjusted upward, we also think Duncan's figures as adopted by Perry would have to have significant downward adjustments. First, we think that the recreation element and personal benefit to the big game hunter-donor reflected in the replacement cost figures of a hunt are not deductible. In other words the recreational big game hunter receives a quid pro quo, the pleasure of pursuing his hobby, so all of the costs of the hunting trip cannot be attributed to the animal that is killed. Also, the use of 1985 replacement costs for donations of old game mounts cannot be justified: if a museum financed its own hunting trip in 1985, it would have newly killed animals to mount and could mount them for its purposes (natural history displays) rather than as trophy mounts. In addition, we would apply a volume discount, which represents the discount that a purchaser of the entire collection would expect, or alternatively, the increased costs that would be involved in selling the items individually. See Epping v. Commissioner, T.C. Memo. 1992-279, 63 T.C.M. 3012 at 3015, *410 1992 RIA T.C. Memo. par. 92,279 at 1381; Estate of Miller v. Commissioner, T.C. Memo. 1991-515, 62 T.C.M. 997 at 1006, par. 91,515 T.C. Memo at 2523. On several occasions during trial, this Court admonished the parties to focus upon and present evidence relating to the only real issue of the case, the valuation of petitioners' charitable donations. We encouraged the parties to vigorously attempt to settle the dispute. Questions of valuation are better resolved by negotiation and agreement of the parties rather than by litigation. However, the parties in this case were unwilling or unable to resolve the matter between themselves. Therefore, based upon the evidence presented in this case, we conclude that respondent's figures (totaling $ 21,500) would require a substantial upward adjustment, and petitioner's figures (totaling $ 113,000) would require a considerable downward adjustment. We find that the total fair market value for the donated animal mounts and rugs in 1985 is $ 75,000. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Valuation of the Other Noncash Donated Items
Respondent disallowed, *411 in their entirety, petitioners' remaining noncash charitable contribution deductions. Usually, petitioners bear the burden of proving that respondent's determination of fair market value of property is in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). However, in this case, respondent determined the value of petitioners' donation to be zero in the notice of deficiency and offered no alternative valuation of the items. Furthermore, for the first time on brief, respondent surmises, without any factual basis in the record, that the items may not have been donated as claimed. We think, as a result, that the weight to be given to respondent's determination should be modified, and the burden of petitioners to show error should be mitigated to some extent. Mast v. Commissioner, T.C. Memo. 1989-119, 56 T.C.M. 1522 at 1527, 58 P-H Memo T.C. par. 89,119 at 576-577 (1989). This does not mean that the burden of proof has shifted from petitioners to respondent, only that petitioners' burden has been somewhat lightened. Id.
Petitioners attached appropriate records to their 1985 *412 tax return, indicating that donations had been made and acknowledged by the recipients. Respondent's conjectures to the contrary do not sway us from finding that the donations were in fact made. As a result, petitioners are entitled to charitable contribution deductions for the nongame mount donations made in 1985. However, as to the determination of the fair market value of the donated items, neither party has provided any evidence helpful to the Court to make such determinations. All we have for many of the items are the appraisals performed by Duncan that were attached to petitioners' 1985 tax return. See supra note 3. Petitioners still bear the burden, although somewhat lightened, to independently substantiate the values of the donated items. Therefore, based on the scant evidence in the record, but the Court's conclusion that donations were indeed made, we have made reasonable determinations, within our discretion, of the donated items' values. We find that these remaining noncash contributions had a total fair market value of $ 10,000. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Additions to Tax under Section 6653(a)(1) *413 and (2)
Respondent has determined that petitioners are liable for additions to tax under section 6653(a)(1) and (2). Section 6653(a)(1) imposes an addition to tax if any part of an underpayment of income tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes a further addition in the amount of 50 percent of the interest due on that portion of the underpayment attributable to the negligence or intentional disregard. Respondent's determination of additions to tax under section 6653(a) is presumed correct and must be sustained unless the taxpayer can establish that he or she was not negligent. Hall v. Commissioner, 729 F.2d 632 (9th Cir. 1984), affg. T.C. Memo. 1982-337. Petitioners bear the burden to prove that the underpayment of tax for the taxable year 1985 was not due to negligence or intentional disregard of rules or regulations. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Bixby v. Commissioner, 58 T.C. 757 (1972). "Negligence is lack of due care or failure to do what a reasonable and ordinarily *414 prudent person would do under the circumstances." Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Section 1.170A-1(c)(1), Income Tax Regs., provides that a charitable contribution of property other than money is deductible at the fair market value of that property as of the time of the contribution. Section 1.170A-13(c)(2) and (3), Income Tax Regs., specifically requires that a taxpayer claiming deductions in excess of $ 5,000 for property donated to a charitable organization obtain a qualified appraisal of that property prepared, signed, and dated by a qualified appraiser. Respondent argues that petitioner did not act reasonably and with due care in ascertaining the proper fair market value of the donated property and that he did not obtain a qualified appraisal prepared by a qualified appraiser. Specifically, respondent contends that Duncan is not a qualified appraiser with respect to this particular donation because "the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated *415 property * * * ". Sec. 1.170A-13(c)(5)(ii), Income Tax Regs.
We disagree. Petitioner has shown that he reasonably relied upon the appraisal of Duncan, a qualified appraiser, as to the fair market value of his donated property. At that time, there was no reason to question Duncan's abilities or reputation. In fact, Duncan was one of the few appraisers available to perform appraisals of big game mounts. The mere fact that petitioner was aware of the availability of deductions for such donations and sought the highest possible valuations of his property does not diminish the fact that he went to an appraiser whose reputation for truth and honesty was not in question, whose credentials as a preeminent appraiser of big game mounts were nationally known. There was no reason for petitioner in 1985 to question Duncan's valuation method or the values he determined for petitioner's donations. Therefore, we find that petitioners' underpayment of tax for the taxable year 1985 was not due to negligence or intentional disregard of rules or regulations. We do not sustain respondent's determination of an addition to tax under section 6653(a)(1) and (2) for that year. Section 6659 Valuation *416 Overstatement
Section 6659(a) provides that a taxpayer is subject to an addition to tax if he or she has an underpayment of tax attributable to a valuation overstatement. A valuation overstatement exists if the value of any property claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation. Sec. 6659(c). In this case, the valuation claimed on the return, $ 154,097, is more than 150 percent of the correct valuation, $ 85,000. Therefore, there is a valuation overstatement, and we sustain an addition to tax in an amount equal to the applicable percentage of the underpayment attributable to the valuation overstatement. [12] Sec. 6659(a). In determining the applicable percentage, a special rule applies for valuation overstatements *417 with respect to charitable contributions: "In the case of any underpayment attributable to a valuation overstatement with respect to charitable deduction property, the applicable percentage * * * shall be 30 percent." Sec. 6659(f)(1). This rule is applicable to returns filed after December 31, 1984, and therefore applies in this case. Section 6661 Substantial Understatement of Income Tax
Section 6661 provides that, "If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement." Sec. 6661(a). An understatement is determined if there is an excess of the amount of tax required to be shown on the return over the amount of tax imposed which is shown on the return. Sec. 6661(b)(2)(A). A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). Section 6661(b)(3) provides that, for purposes of determining the amount of the addition to tax assessed under section 6661(a), the portion of the substantial understatement *418 on which a penalty is imposed under section 6659 shall not be taken into account. In this case, all of petitioners' underpayment of tax is attributable to a valuation overstatement. There is no substantial understatement apart from the valuation overstatement to which section 6661(a) could attach. Therefore, there is no addition under section 6661(a) in this case. Section 6621(c) Increased Interest
Respondent seeks increased interest pursuant to section 6621(c) (formerly section 6621(d)). Section 6621(c) provides for an increase in the interest rate to 120 percent of the statutory rate on underpayments of tax if a substantial understatement is attributable to a tax-motivated transaction. Section 6621(c)(3)(A)(i) includes any valuation overstatement, within the meaning of section 6659(c), in the term "tax motivated transaction". As stated above, there is a valuation overstatement if the value of any property claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation. Sec. 6659(c). The deductions claimed on petitioners' 1985 return were more than 150 percent of the values we have determined herein. Therefore, section *419 6659(c) does apply, and petitioners are liable for the increased interest provided by section 6621(c). Based on the foregoing, Decision will be entered under Rule 155. Footnotes
1. The parties have now agreed that the game mounts, for which charitable deductions have been claimed, were in fact donated during the taxable year at issue and that the donee institution, the North Carolina State Museum of Natural History, qualifies as a charitable organization for purposes of sec. 170. Prior to trial respondent moved for leave to amend her answer, which the Court granted, and respondent's amendment to answer asserted an addition to tax under sec. 6653(b)(1) and (2) for fraud on the part of petitioner George H. Engel. After trial, respondent conceded the fraud issue.↩
2. Petitioner had made similar donations of animal mounts to that museum in 1983 and 1984, which were also appraised by Duncan. Those donations were the subject of a Tax Court case that was settled by the parties after trial. Docket No. 27802-88.↩
3. Duncan's appraisal is in the record only as an attachment to petitioners' 1985 tax return, and, like the tax return itself, is only a statement of petitioners' claim and is not proof of the correctness of any figures stated therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051↩ (1957). Neither party proffered Duncan's appraisal as an expert report or called Duncan as that party's expert. Duncan's appraisal does not constitute an expert report within the meaning of Rule 143(f). Moreover, even if that appraisal were treated as Duncan's direct testimony, it would still be of little assistance to the Court. There is no explanation or support in the record for any of the figures contained in the Duncan appraisal.
4. Petitioners determined that they were entitled to deduct only $ 145,441 of the $ 154,097 by virtue of the limitation on such donations to 30 percent of their adjusted gross income of $ 484,804.↩
5. Duncan also had a reputation as an expert evaluator of objects d'art, including stamps, coins, and paintings. Duncan would appraise art and antiques for insurance companies and banks. He listed his appraisal services for art and antiques in the Yellow Pages.↩
6. Zanotti explains in his catalog that some mounts come from hunters, and that he purchases large quantities of game mounts from estate sales. He also states that he is able to get animals from African wildlife game preserves where managed "culling" of animals takes place to preserve food sources and the quality survival of the species. Occasionally, Zanotti buys from farms that raise animals specifically for their pelts, skins or feathers. Petitioners contend that these sources are not compatible with the quality, world-class game mounts that petitioner has collected in safaris around the world.↩
7. Zanotti's catalog is filled with unusual items such as animal teeth and claws for use in jewelry, shark jaws, exotic mounted insects, horn and antler furniture and accessories, and elephant foot stools. In the catalog, Zanotti describes his company as a volume purchaser of trophies, mainly from collections offered at estate sales. He states that "We enjoy removing these pieces from storage or non-use and placing them with people who enjoy displaying them in their family rooms or vacation homes".↩
8. In the late 1980s, Duncan and Dr. Funderburg were under investigation for conspiracy to import endangered species. The U.S. Fish and Wildlife Service raided the Museum and seized its files and papers. About the time of petitioner's earlier tax case involving his contributions of game mounts to this same Museum in 1983 and 1984 (see supra↩ note 2), Dr. Funderburg had a subordinate employee at the Museum randomly label certain game mounts as having been contributed by petitioner in 1984.
9. Charles Dunning, president of Dunning's Auction Service, also describes auction sales as usually distress sales or estate sales in which there is some compulsion to sell.↩
10. Estate of Rodriguez v. Commissioner, T.C. Memo. 1989-13↩.
11. At the time of trial, Duncan was serving a 10-month prison sentence for his guilty plea to the charge of conspiracy to import endangered animals. Duncan entered into an agreement with respondent to provide testimony in this case in exchange for respondent's forbearance in bringing an abusive tax shelter case against him and respondent's efforts to help Duncan secure a reduction in his prison sentence. Despite obvious pressures on Duncan to provide testimony favorable to respondent's theories, Duncan was quite forthcoming under oath, and we found him to be generally a credible witness. The Court thinks that Duncan may well have been less than candid with counsel for both parties in their interviews with him, selectively intimating or telling each side what they wanted to hear. Nonetheless, the Court is satisfied that Duncan by and large testified truthfully under oath in this proceeding.↩
12. On brief petitioners argue that respondent abused her discretion in failing to waive the addition under the authority of sec. 6659(e). There is no evidence in the record to establish an abuse of discretion on the part of respondent.↩