T.C. Memo. 2017-165

UNITED STATES TAX COURT

PAUL A. GARDNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14695-12.                    Filed August 24, 2017.

Gordon Fairle Moore, II, Jonathan P. Rardin, Tiffany W. Donio, and Scott
D. Jacobson, for petitioner.

Daniel C. Munce and Brian S. Jones, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge: To paraphrase Ernest Hemingway, there is no hunting
like the hunting for tax deductions. Petitioner, an avid big-game hunter, took this
advice to heart. In 2006 he opted to downsize his trophy collection by donating to
an ecological foundation many of his less desirable hunting specimens. Relying

[*2] on an appraisal, he claimed under section 170 a charitable contribution deduction of $1,425,900.[1]  Because that amount exceeded the maximum allowable as a deduction for 2006, see sec. 170(d)(1)(A), he later carried the balance of the deduction to 2007 and 2008.

The Internal Revenue Service (IRS or respondent) selected petitioner's 2006-2008 returns for examination.  It determined that the value of the hunting specimens he had contributed was at most $163,045.  The IRS accordingly determined deficiencies of $137,647 for 2007 and $274,228 for 2008.

We must decide the correct methodology for determining the fair market value (FMV) of petitioner's hunting specimens.  Should we use comparable sales, as respondent urges, or replacement cost, for which petitioner advocates?  We have no difficulty answering this question in respondent's favor.

FINDINGS OF FACT

The parties submitted before trial a stipulation of facts including exhibits that is incorporated by this reference.  Petitioner resided in Pennsylvania when he timely petitioned this Court.

---

[1]All statutory references are to the Internal Revenue Code (Code) as in effect for the tax years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

**[*3]** I.    The Donation

Petitioner is the owner and CEO of several family-owned propane gas distribution companies based in Berwick, Pennsylvania.  He has been an ardent hunter from an early age; since the mid-1980s he has regularly traveled overseas to participate in safaris.  He has hunted big game in Africa, Asia, Europe (including Russia), and South America, and throughout the United States.  He has been on 20 to 25 safaris during the last two years, a pace that reflects his previous experience.

On a typical hunting expedition petitioner would kill multiple animals.  Following a kill the animal was sometimes skinned on the spot, but was usually loaded onto a vehicle for transportation to the skinning shed.  After the animal was skinned, the meat was distributed to the local population and the hide was prepared and dried.

Like many hunters petitioner preserved the remains of the animals he shot in a "trophy room" in his house.  In petitioner's words, a trophy room is a "big, open room" with appropriate lighting and temperature and humidity controls, in which "you can anchor all the animals to the wall" or "hang stuff from the ceiling."  Petitioner had a professionally designed trophy room with special lighting to eliminate shadows, reinforced walls to provide better anchoring for heavier mounts, and an insect control system.

**[\*4]**   In his trophy room petitioner had a number of "full body mounts," i.e., complete taxidermied animals, often lying on a rock or similarly displayed.  He had many "shoulder mounts," which consisted of the heads and necks of the animals down to the breastplates.  And he had a variety of full animal skins displayed as wall hangings or rugs.  Collectively, these are generally considered the most attractive and desirable types of hunting trophies.

When a taxidermist does a "full body mount," he generally does not use the skull; instead he creates a mannequin and puts the skin around it.  Similarly, when a taxidermist does a "shoulder mount," he does not use hooves, backskin, or other body parts.  And when a taxidermist prepares a full skin he does not use skeletal parts, horns, or antlers.  Petitioner thus had numerous skulls, antlers, hooves, ears, horns, and other body parts that taxidermists had returned to him after completing their work.  He displayed some of these items on coffee tables or on the floor of his trophy room.  But that floor got "pretty cluttered," and so he shifted many items into an adjoining room.

Following a divorce in 2005 petitioner moved to a new residence.  He immediately began building in that house a new trophy room, which was completed in early 2006.  That trophy room has since been featured in a hunting publication, "Trophy Rooms Around the World."

[*5]   While contractors were completing their work on petitioner's new trophy room, he went to Canada to hunt white-tailed deer.  One evening he struck up a conversation with another hunter about downsizing his collection to avoid "overcrowd[ing] the new trophy room."  His fellow hunter, who had successfully deaccessioned unwanted animal specimens, suggested a donation to the Dallas Ecological Foundation (DEF), an organization exempt from tax under section 501(a) and (c)(3).[2]  That hunter had himself donated specimens to DEF and told petitioner that "he knew all the ins and outs."  He agreed to "hook petitioner up * * * with an appraiser named Fullington."

Petitioner promptly contacted Richard W. Fullington, Ph.D., in Richardson, Texas.  Following a "good conversation" with Dr. Fullington, petitioner selected a total of 177 items from his collection for donation to DEF.  These items included no full body mounts and only three shoulder mounts (one of which was a "European mount" featuring just the animal's head).  The remaining 174 items consisted of:  58 skins and hides, 72 skulls (39 with horns or antlers), 15 horns, 15 antlers, 6 tails, 5 sets of hooves, 2 ears, and 1 set of tusks.

---

[2]Shortly after the parties completed post-trial briefing in this case, DEF changed its name to "Outdoors Tomorrow Foundation."

**[*6]**   None of these 177 specimens was of "record book" quality.  Certain hunting organizations maintain record books of big-game kills using proprietary scoring systems.  A specimen may qualify for listing in record books on the basis of the animal's size or other features, or the animal's unusual provenance.  The two most prominent record books are compiled by the Safari Club International (SCI) and the Boone and Crockett Club, respectively.  At the time petitioner selected the 177 specimens for donation to DEF, he appears to have had three kills ranked in the SCI record book.  But he did not select any specimen from those kills for contribution to DEF.

Petitioner engaged Dr. Fullington to appraise the 177 specimens, agreeing to pay $125 per specimen for a total of $22,125.  Dr. Fullington's report dated April 19, 2006, used the "replacement cost" method to determine the FMV of these items.  He estimated what it would cost to replace each item with a specimen of like quality by tallying up the expected out-of-pocket expenses for traveling to the hunting site, being on safari for the requisite number of days, killing the animal, removing and preserving the given body part, shipping it back to the United States, and defraying the taxidermy costs of stuffing, mounting, or otherwise preparing the item for display.  He considered such factors as "the prorated unit cost, shipping fees, taxidermy fees, and permit/trophy fees."  At the time he drafted his

[*7] appraisal Dr. Fullington knew that petitioner intended to claim a charitable contribution deduction for the 177 items.

Dr. Fullington's report, which was attached to petitioner's 2006 Federal income tax return, contains a separate sheet for each of the 177 specimens. Each sheet includes a photograph of the specimen. Below the photograph is a summary that lists the State or foreign country in which the animal was killed (if known) and provides an estimate of the specimen's quality (invariably described as "excellent"). The summary included no other information about the specimen's "provenance."

At the bottom of each sheet was Dr. Fullington's appraisal of the specimen's value. Using his "replacement cost" approach, he valued the tanned skin of a Central Asian sheep at $75,600 on the theory that it would cost that much to bag another similar sheep. On the same theory he valued a European mount of the horns of a desert bighorn sheep at $56,800. According to Dr. Fullington, the FMV of the 177 specimens was $1,425,900.

Dr. Fullington also arranged to have the specimens delivered to DEF, apparently during March 2006. In a letter dated April 26, 2006, DEF thanked petitioner for his "contribution of 177 trophy animals." (Petitioner did not in fact donate 177 trophy animals; by his admission, the 177 specimens would have come from far

[*8] fewer than 177 animals.)  Petitioner has never visited DEF and does not know whether DEF ever exhibited any of the items.  Petitioner did not call any witness from DEF to testify.  The evidence established that the 177 specimens "had been subsequently dispersed"; DEF apparently put the donated specimens in storage and later sold them or gave them away.[3]

Dr. Fullington did not testify at trial.  Because the 177 donated specimens had been dispersed to unknown locations and were no longer accessible, none of the experts who testified at trial was able to conduct a physical inspection to assess the specimens' quality.  The experts' quality assessments thus had to be based on Dr. Fullington's photographs, which were small in size and of poor resolution.

II.    The Deduction

Relying on Dr. Fullington's appraisal petitioner reported on his 2006 return a charitable contribution of $1,425,900.  Section 170(b)(1)(C)(i) capped his deduction at 30% of his adjusted gross income for 2006; he thus claimed a deduction

---

[3]Respondent sought to introduce evidence purporting to establish that DEF ultimately destroyed specimens that were not salable, donated others to a taxidermy school, and gave the rest to a women's auction to make pillows, chairs, and stools. This proffer took the form of a deposition of a current DEF officer who did not testify at trial, to which petitioner objected on hearsay grounds.  Because we find the trial testimony of respondent's expert dispositive with respect to the specimens' FMV, the proferred evidence, even if relevant and otherwise admissible, has no incremental probative value.  Finding it "needlessly * * * cumulative," Fed. R. Evid. 403, we decline to consider this evidence.

**[\*9]** of $129,459 for that year. Section 170(b)(1)(C)(ii) allowed him to carry forward the excess contribution into the next five tax years. In reliance on that provision he deducted $429,313 in 2007 and another $783,509 in 2008.[4]

During examination of petitioner's 2006-2008 returns an IRS staff appraiser determined the aggregate FMV of the 177 specimens to be only $163,045. That FMV, while sufficient to cover petitioner's claimed deduction for 2006, left only $33,586 to be carried forward. The IRS accordingly issued petitioner a timely notice of deficiency that disallowed $395,800 of the deduction he had claimed for 2007[5] and the entire $783,509 deduction he had claimed for 2008. Reflecting those adjustments, the notice determined deficiencies of $137,647 and $274,228 for 2007 and 2008, respectively.

## OPINION

The IRS' determinations in a notice of deficiency are generally presumed correct, though the taxpayer can rebut this presumption. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The taxpayer bears the burden of proving

---

[4]The deductions petitioner claimed for 2006-2008 total $1,342,281. He presumably carried to 2009 the remaining balance of $83,619, which is not before us.

[5]It appears that the disallowance for 2007 should have been $395,727 (i.e., $429,313 – $33,586). The record does not explain the $73 discrepancy, and to resolve it we will order a Rule 155 computation.

**[*10]** his entitlement to deductions allowed by the Code and of substantiating the amounts of claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. In certain circumstances the burden of proof on factual issues may shift to the Commissioner. See sec. 7491(a); Rule 142(a). Petitioner does not contend that either provision applies here. He thus bears the burden of proving that he is entitled to the deductions he claimed.

I.      Governing Legal Principles

Section 170(a)(1) allows a deduction for any charitable contribution made within the tax year, subject to the annual limitations discussed previously. If the taxpayer makes a charitable contribution of property other than money, the amount of the contribution is generally equal to the FMV of the property at the time the gift is made. See sec. 1.170A-1(c)(1), Income Tax Regs. The parties agree that petitioner satisfied the various procedural requirements applicable to his gift, including the need for a "qualified appraisal." See sec. 170(f)(8), (11)(D); sec. 1.170A-13(c)(3), (5), Income Tax Regs. The parties' sole disagreement concerns the FMV of the 177 specimens. Petitioner insists on a value at least as high as the $1,425,900 figure that Dr. Fullington determined, while respondent argues for the $163,045 valuation set forth in the notice of deficiency.

**[\*11]**  The regulations define FMV as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  Sec. 1.170A-1(c)(2), Income Tax Regs.  Determining the FMV of donated property entails a factual inquiry.  Estate of DeBie v. Commissioner, 56 T.C. 876, 894 (1971).  Petitioner bears the burden of proving the FMV of the donated items.

To support their respective positions the parties retained experts who testified at trial.  An expert witness' opinion is admissible if it assists the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.  We evaluate an expert's opinion in light of his qualifications and the evidence in the record.  See Parker v. Commissioner, 86 T.C. 547, 561 (1986).  When experts offer differing estimates of FMV, we weigh those estimates by examining (among other things) the factors they considered in reaching their conclusions.  See Casey v. Commissioner, 38 T.C. 357, 381 (1962).

We are not bound by an expert opinion that we find contrary to our judgment.  We may accept an expert's opinion in its entirety, or we may be selective as to the portions we find reliable.  See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938);  Parker, 86 T.C. at 561-562;  Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980).  We may also determine FMV on the

**[\*12]** basis of our own examination of the record evidence.  See <u>Silverman v.</u>

<u>Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), <u>aff'g</u> T.C. Memo. 1974-285.

II.     <u>Expert Testimony</u>

The parties' dispute boils down to a question of valuation methodology.

Respondent urges that we determine the FMV of the 177 specimens by consider-

ing market prices for comparable items.  Petitioner insists that the items he gave

DEF are museum-quality hunting specimens endowed with special value for study

and research, that they have no true comparables in the open market, and that we

must accordingly determine their value by estimating what it would cost to replace

them.

In deciding who is right, an important factor is whether the items are "com-

modities" or "collectibles."  If a hunting trophy is properly considered a collect-

ible, it will matter who shot the animal, precisely where it was shot, and which

collectors owned it previously.  The "provenance" of the items, by contrast, will

be largely irrelevant if they are valued as commodities.  In that case their value,

like the value of steel, sugar, or other commodities, can be determined (assuming

the existence of a reasonably active market) by consulting the prices that compar-

able items fetch in the marketplace.  We have no difficulty concluding that the 177

**[\*13]** specimens were commodities and that respondent's market price approach supplies the proper methodology for ascertaining their value.

Although petitioner attached to his 2006 tax return a copy of Dr. Fullington's report, he did not engage Dr. Fullington as an expert or seek to move his report into evidence. That report is part of the record for the sole purpose of demonstrating petitioner's compliance with the substantiation requirement of section 170(f)(11)(D). However, because petitioner's specimens were delivered to DEF a decade ago and "had been subsequently dispersed," they were no longer available for inspection. Of necessity, therefore, both sides' experts relied on Dr. Fullington's appraisal for an inventory of the items and photographs of all 177 specimens. It is thus useful to consider at the outset the contents of his April 2006 report.

That report leaves much to be desired. It correctly notes that none of the specimens had "record book" status. It accords each item a rating for "specimen quality" and "taxidermy quality." Although Dr. Fullington gave every single item a rating of "excellent" on both scores, the photographs often suggest that a lower rating would have been appropriate. His entries under the "provenance" category are meager; the only information he provides is the State or foreign country in which the animal was killed. Each entry is followed by a forward slash and then the word "unknown," suggesting that Dr. Fullington may have lacked confidence

**[\*14]** in the specimen's actual provenance, even at that high level of generality. Dr. Fullington supplied no evidence to support the premise for his adoption of a "replacement cost" approach, i.e., that "there are no equitable comparable sales" for any of the 177 specimen items.

A.     Respondent's Expert

Respondent offered and we recognized Forrest Ketner as an expert in taxidermy and the appraisal of taxidermy items. He has been involved with the taxidermy trade for more than 30 years. He owns and operates a business that stuffs and mounts birds, fish, and small and large mammals for display or study. He is a licensed taxidermist, has taught taxidermy classes, and has authored books on the subject.

Since 2013 Mr. Ketner has been a certified appraiser specializing in taxidermy items. He has conducted at least 20 appraisals for insurance purposes and for valuing trophy mount donations. He has been retained to conduct taxidermy appraisals by museums, State and local governments, and the IRS. He is the only expert that we recognized at trial as an expert in taxidermy and the appraisal of taxidermy items.

Mr. Ketner prepared an appraisal report that used the market approach to determine the FMV of the 177 animal specimens. On the assumption that each

**[\*15]** specimen was in excellent condition, as Dr. Fullington had asserted, Mr. Ketner determined the aggregate FMV of the 177 specimens to be $41,140. Examining the photographs, however, Mr. Ketner observed what he believed to be defects in many items. Taking these defects into account, he reduced his appraised value to $34,240.[6]

Mr. Ketner's testimony, which we found credible and convincing, characterized the donated specimens as consisting mostly of "remnants and scraps" of a trophy collection. "It's what's left over when you're done mounting an animal," or what is "not needed for what's hanging on the wall." His report noted that the specimens included 29 partial skins or backskins, which are portions of the hide left over after a shoulder mount. Many of the skulls, tails, and hooves were likewise left-over items. He appraised 19 tanned skins at a low value, noting their advanced age at the time of donation, which likely rendered them unable to hold stitches for purposes of mounting. He noted that 10 of the antlers compared unfavorably in size with most antler trophies available for purchase on the open

---

[6]Although Mr. Ketner's best-case FMV estimate came in well below the $163,045 value reflected in the notice of deficiency, respondent has not sought to amend his answer to assert an increased deficiency. Rather, he "has given petitioner the benefit of the $163,045 deduction originally allowed."

[*16] market.  He ascribed a low value to two full American bear skins because of visible patches of missing fur.

To derive comparables for the 177 donated specimens Mr. Ketner consulted market data from bricks-and-mortar auction houses, online auction sites (such as eBay), and other websites specializing in hunting specimens similar to those involved here.  He opined that there "has always been a market" for such items.  Historically, "[t]axidermists would buy, sell, swap, or trade these items as they were needed * * * to complete projects, or to mount for their own collections."  More recently, with the proliferation of online auction sites, buyers and sellers include the general public rather than just the taxidermist community.  The market for such items now is "wide open," with few if any barriers to entry.

For each of the 177 specimens, Mr. Ketner sought to identify the best available comparables on the basis of size and quality.  For some items he found as many as 10 or 20 comparables, in which event he selected one in the middle.  For some items he found only two comparables; in that case he generally took the average.  All in all, he found 504 comparables for the 177 specimens.  He acknowledged that all but four of his comparables were from years after 2006, but credibly testified that they were nevertheless similar because "[t]he market hasn't changed much in the last 10 years."  In his rebuttal report he made adjustments to

**[*17]** account for differences in value characteristics between these comparables and the 177 donated specimens to arrive at his final FMV determination.

B.   Petitioner's Experts

Petitioner's first two experts were Anibal Rodriguez and Victor Wiener. Neither assigned a dollar value to the 177 specimens; rather, each sought only to defend "replacement cost" as the proper valuation methodology. The thrust of their testimony was that Mr. Ketner's market approach could not capture the FMV of the 177 specimens because they were museum-quality pieces uniquely valuable for research. Neither Mr. Rodriguez nor Mr. Wiener provided any factual support for this theory, and we found their testimony wholly unreliable.

Mr. Rodriguez retired after 37 years as a technical consultant in the anthropology division of the American Museum of Natural History in New York. He is neither an appraiser nor a taxidermist. He has never hunted animals and has never bought or sold items like those at issue here. We recognized him as an expert museum technician familiar with the manner of assembling museum collections.

Mr. Rodriguez testified that the most desirable hunting specimens for a museum collection would be "fully documented specimens that were not compromised by chemical treatments and had the proper licenses and known provenance." Given the demands of anthropological research, Mr. Rodriguez stated that

[*18] a reputable museum would normally accept donations of animal specimens only if they were accompanied by detailed provenance information, including the precise location where the animal was hunted, the nature of that habitat, the method by which the animal was hunted, and the health of the animal at the time it was taken. "Museums curate these materials," he stated, "and make them available to researchers as needed."

Mr. Rodriguez opined that the specimens petitioner donated to DEF would be "incredibly valuable to museum collections." That was assertedly so because of their "high quality and known points of origin and other information associated with them." We found this assertion devoid of any factual foundation.

On cross-examination Mr. Rodriguez admitted that the Fullington report was his sole source for provenance information about the 177 specimens. That report does not establish the "high quality" of the specimens; the photographs often show the contrary. That report is likewise weak on "provenance": It lists merely the State or country of the kill followed by the word "unknown." It includes no details regarding the geographical coordinates, climate, or vegetation of the place where the animal was killed, nor any indication as to the health of the animal. It includes no "other information associated with" the specimens. It has no information as to whether the animals were hunted pursuant to "proper li-

[*19] censes," or whether records or certificates of authenticity exist for any of the specimens. And it makes clear that many of the specimens (including tanned skins) had been subject to chemicals as part of the taxidermy process.

In short, Mr. Rodriguez assumed what he had undertaken to prove. He testified as to what features museum-quality hunting specimens should display. He then asserted, with no factual basis whatsoever, that petitioner's 177 specimens displayed those features.

Mr. Wiener is an art historian and an appraiser specializing in the decorative and fine arts. We recognized him as an expert in appraisal and appraisal method-ologies. He acknowledged that he has no expertise in appraising hunting speci-mens, and he offered no opinion as to what the FMV of the 177 specimens was. He nevertheless insisted, with no discernible factual support, that the "replacement cost" approach urged by petitioner was the "most appropriate" method to deter-mine FMV.

To begin with, it is difficult to consider Mr. Wiener's expert testimony and conclusion as his independent opinion. He characterized Mr. Rodriguez's report as "a critical analysis" of the Fullington report and admitted that he had relied on the "Rodriguez report for [his] opinion." And he added that he had also consulted

[*20] with petitioner. When asked whether he was relying on Mr. Rodriguez's and petitioner's opinions, he responded: "I most certainly am."

Mr. Wiener's report displays numerous errors of logic and fact. He opines that "[w]ith the exception of two taxidermy sheep heads, the specimens are preserved in a natural state, befitting a study collection." But on cross-examination, he admitted not knowing what "preserved in a natural state" means. He conceded that many, if not all, of the 177 specimens underwent or may have undergone taxidermy. When pressed on how he could opine that these taxidermied specimens were "preserved in a natural state," he responded: "Because I reviewed this with Anibal Rodriguez who is an authority on this and * * * that's what he told me."

Although Mr. Wiener opined that "all [177] specimens * * * are in excellent condition and appropriate for inclusion in a scientific study collection," he tracked Mr. Rodriguez in assuming what he sought to prove. His opinion to this effect was premised on an "extraordinary assumption," namely, that "all specimens are in excellent condition as reported." He admitted that his opinion was both tautological and derivative, having been based on his "review of the report produced by Anibal Rodriguez." On cross-examination he acknowledged that he could tell from the photographs that many specimens were actually in rather poor condition. All in all we found Mr. Wiener's testimony to have no probative value.

**[*21]** Petitioner's third expert, Jack Atcheson, is an international hunting consultant whose firm specializes in providing cost estimates for "fair chase" hunting expeditions. As his firm's publicity brochures explain, a "fair chase" hunting adventure is "a grand experience," quite unlike the humdrum guided tours provided by local travel agencies. He was the only one of petitioner's experts to put a dollar figure on the "replacement cost" for the 177 specimens. He opined that this cost would be $2,554,300, or $1,128,400 more than the "replacement cost" value that petitioner reported on his tax returns.

Mr. Atcheson arrived at this number by estimating the out-of-pocket costs a hunter would incur (including travel, food, lodging, permit fees, and local guides) to go on 177 separate safaris organized as luxurious "fair chase" hunting expeditions. He assumed that each of the 177 specimens would be harvested on a separate trip, would be crated individually, and would be shipped back by itself. To these estimated costs he added the expense of doing the necessary taxidermy and mounting work.

Mr. Atcheson made no allowance for the hunter's personal enjoyment of these "grand adventures." To account for the possibility that his estimates were at "the high end," he applied a flat 15% reduction, but he offered no rationale for that percentage. He grudgingly conceded that multiple animals could be hunted in one

**[\*22]** trip, that multiple specimens could be harvested from the same animal, and that multiple specimens could be shipped in a single crate. (Petitioner admitted that he had often hunted multiple animals on a single trip and harvested multiple specimens from the same animal.) But Mr. Atcheson nevertheless insisted that the cost of 177 separate safaris and 177 separate shipments was the appropriate way to determine the FMV of the 177 specimens.

III. Analysis

This is not the first time we have had to adjudicate a valuation dispute over a charitable contribution of hunting specimens.[7] As with any other valuation exercise, if an active market exists, we generally rely on comparable sales. In Robson v. Commissioner, T.C. Memo. 1997-176, 73 T.C.M. (CCH) 2574, 2576, aff'd, 172 F.3d 876 (9th Cir. 1999), which involved a contribution of shoulder mounts, capes, and horns, we found that "an active market exists throughout the United States for substantially comparable items." In Epping v. Commissioner, T.C.

_____

[7]There may be fewer such disputes in the future. In the Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 1214, 120 Stat. at 1077, Congress added Code provisions limiting the deduction for the charitable contribution of any "prepared, stuffed, or mounted" animal specimen to the lower of FMV or "the cost of the preparing, stuffing, or mounting." See sec. 170(e)(1)(B)(iv), (f)(15). The new provisions thus disallow any deduction for the direct and indirect costs of hunting or killing the animal, including travel and transportation costs. Because those provisions apply to contributions made after July 25, 2006, they are inapplicable to petitioner's gift, which was made in April 2006.

[*23] Memo. 1992-279, 63 T.C.M. (CCH) 3012, 3013, 3014, which involved "an assortment of animal mounts, horns, rugs, and antlers," we again found that "an active market exists with substantial comparable sale items."

Replacement cost may be a relevant measure of value "where the property is unique, the market is limited, and there is no evidence of comparable sales." Robson, 73 T.C.M. (CCH) at 2576 (citing Estate of Palmer v. Commissioner, 839 F.2d 420, 424 (8th Cir. 1988), rev'g 86 T.C. 66 (1986)). For us to eschew comparable sales in favor of replacement cost, the taxpayer must establish, not only the absence of an active market for comparable items, but also a "probative correlation" between replacement cost and FMV. Rainier Cos. v. Commissioner, T.C. Memo. 1977-351, 36 T.C.M. (CCH) 1404, 1405-1406 (citing Rev. Proc. 66-49, 1966-2 C.B. 1257); see also Crocker v. Commissioner, T.C. Memo. 1998-204, 75 T.C.M. (CCH) 2414, 2442.

Mr. Ketner's written and oral testimony persuaded us that the 177 donated items were neither world-class trophies nor museum-quality research specimens, but were mostly "remnants, leftovers, and scraps" of the collection displayed in petitioner's trophy room. Petitioner's own testimony indicated that he wished to "downsize" his collection by deaccessioning unwanted items. Although his experts asserted that all specimens were of "excellent" quality, they offered no fac-

[*24] tual backing for that assertion and admitted that Dr. Fullington's photographs often indicated the opposite. And although petitioner had participated in several record hunts, not a single specimen that he selected for donation to DEF was of record-book quality.

In short, the 177 specimens were clearly commodities, not collectibles. For commodities such as these, the determination of FMV will generally be based on market prices for similar items. Mr. Ketner credibly testified that an active market existed in which taxidermied products like petitioner's have long traded and that the internet has vastly expanded that marketplace. Indeed, he found 504 comparable sales transactions on traditional and internet auction sites. Petitioner offered no evidence or expert testimony to contradict Mr. Ketner's testimony that an active market for such items existed at the time of the gift.

Relying on evidence of comparable sales, Mr. Ketner opined that the FMV of the 177 specimens was between $41,140 (assuming that all specimens were of high quality) and $34,240 (assuming that they were not). Petitioner did not seriously challenge Mr. Ketner's data and introduced no evidence of market prices for comparable items. Petitioner thus failed to carry his burden of proving that the FMV of the 177 specimens exceeded the $163,045 value that the IRS allowed in the notice of deficiency. See Robson, 73 T.C.M. (CCH) at 2576-2577.

**[\*25]** On two prior occasions, we have given consideration to replacement cost as one element in determining the FMV of donated animal specimens. See Engel v. Commissioner, T.C. Memo. 1993-362, 66 T.C.M. (CCH) 378; Estate of Miller v. Commissioner, T.C. Memo. 1991-515, 62 T.C.M. (CCH) 997, aff'd without published opinion, 983 F.2d 232 (5th Cir. 1993). Compare Robson, 73 T.C.M. (CCH) at 2576 (rejecting use of replacement cost). In Engel we concluded that, "when only a thin market for the donated items exists * * *, it is appropriate to consider replacement costs as one factor in the overall valuation method." 66 T.C.M. (CCH) at 385 (emphasis in original) (citing Estate of Miller). Both cases turned on our evaluation of the expert testimony.

In Estate of Miller, most of the donated trophies appear to have been "full-body trophies" and some were ranked in the SCI record book. 62 T.C.M. (CCH) at 999, 1005. The Commissioner's expert admitted that he had neglected to adjust his valuations to reflect the specimens' record-book status. See id. at 1005. In Engel, the donated items appear to have been "shoulder mounts" or full skins. See 66 T.C.M. (CCH) at 380. The taxpayer-donor had "listed a number of animals in the * * * [SCI] record books" and the donated "specimens were in excellent condition and indicated a degree of care and pride above average." Id. at 379, 383. Here, by contrast, the 177 specimens included no full-body mounts and only

[*26] three shoulder mounts; none of the donated items had record-book status; and the condition of the specimens (given the impossibility of physical inspection) was questionable at best.

In Engel, we relied to some degree on replacement cost because the evidence suggested that, in 1985, the "market in world-class trophy mounts" was "rather thin" and not "established." 66 T.C.M. (CCH) at 384. Thus, the comparable prices upon which the Commissioner relied did not indicate the prices at which the taxpayer's "world-class animal trophies would sell." Id. at 385. Here, by contrast, petitioner donated no world-class animal trophies but mostly "remnants, leftovers, and scraps" of the vastly superior collection that he retained. The 177 specimens involved here resemble those at issue in Epping--"an assortment of animal mounts, horns, rugs, and antlers"--for which we found that "an active market exists." 63 T.C.M. (CCH) at 3014. Mr. Ketner convincingly testified about the existence of such an active market, and petitioner's experts offered no persuasive testimony to the contrary.

In neither Engel nor Estate of Miller, moreover, did we find the FMV of the hunting specimens to be their full replacement cost, as petitioner urges here. Quite the contrary: In Engel we concluded that use of current "replacement costs for donations of old game mounts cannot be justified," pointing out that "if a museum

[*27] financed its own hunting trip * * *, it would have newly killed animals to mount and could mount them for its purposes (natural history displays) rather than as trophy mounts." 66 T.C.M. (CCH) at 385; accord, Estate of Miller, 62 T.C.M. (CCH) at 1006 (noting that "a museum would not pay * * * full replacement value for a trophy, because for that amount of money, a museum would go into the field and replace the trophy itself").

In Engel, we required only that the Commissioner's expert's comparable sales figures "be adjusted upward to account for the better quality" of the tax-payer's specimens. 66 T.C.M. (CCH) at 385. Petitioner has made no case for such an "upward adjustment" here. And even if he had made such a case, we find Mr. Atcheson's formula for determining "replacement cost" unacceptable because it took no account of the personal pleasure petitioner derived from his safaris. See ibid. ("[T]he recreational big game hunter receives a quid pro quo, the pleasure of pursuing his hobby, so all the costs of the hunting trip cannot be attributed to the animal that is killed.").[8]

---

[8]Even if we were to consider replacement costs and make some upward adjustment to the values that Mr. Ketner determined, which ranged from $34,240 to $41,140, we would not get anywhere close to the $163,045 valuation that the IRS allowed petitioner in the notice of deficiency.

**[*28]**  Indeed, this case is distinguishable from <u>Engel</u> and <u>Estate of Miller</u> in a more fundamental respect.  Petitioner is not contending, and he could not plausibly contend, that any of the 177 specimens was a world-class hunting trophy that rarely appears in the open market.  Rather, his theory is that replacement cost must be used because the items he donated to DEF were pristine specimens of excellent provenance that would be ideal for museum study and research.

But petitioner did not introduce a shred of evidence to prove that the specimens fit this bill.  They had been dispersed to unknown locations; they were unavailable for physical inspection; and the photographs of them were mediocre.  Information about their provenance, especially the sort that would interest a museum, was extremely sparse.  In fact, they appear to have been mine-run taxidermied items whose chemical treatment would make them unattractive to a public institution.  Petitioner did kill the animals himself, and the specimens thus had no intervening owners.  But this will be true whenever a hunter deaccessions unwanted scraps from his collection, and petitioner introduced no evidence suggesting that this aspect of "provenance" holds importance for museums.

In sum, petitioner has failed to carry his burden of proving that the FMV of the 177 specimens exceeded the $163,045 value that the IRS allowed in the notice of deficiency.  We will accordingly sustain respondent's decision to disallow the

**[*29]** bulk of the charitable contribution deduction petitioner claimed for 2007 and the entirety of the charitable contribution deduction he claimed for 2008.

To implement the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.